## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BRENDA RYAN, individually and on behalf of all others similarly situated,<br><br>                              Plaintiff,<br><br>        v.<br><br>STRAIGHT ARROW PRODUCTS, INC.,<br><br>                              Defendant. | **Case No.: 1:21-cv-04485**<br><br>**CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

## FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiff, Brenda Ryan ("**Plaintiff**"), on behalf of herself and all others similarly situated, brings this class action against Defendant Straight Arrow Products, Inc. (**"Straight Arrow"**) and alleges on personal knowledge, investigation of her counsel, and on information and belief as follows:

## INTRODUCTION

1.      This is a nationwide class action brought by Plaintiff on behalf of herself and other similarly situated consumers who purchased various Mane 'n Tail branded Shampoo and Conditioner Products[1] (collectively, the "**Products**" or "**Mane 'n Tail Products**") for personal or household use and not for resale ("**Class**" or "**Class Members**").

2.      Plaintiff purchased the Products because of Straight Arrow's uniform false representation that the Products would restore, revitalize, recondition, refreshen, nourish, fortify, moisturize, strengthen, and/or clean her hair from root to tip. Unbeknownst to Plaintiff

---

[1] The Products include Mane 'n Tail branded: Gentle Clarifying Shampoo; Gentle Replenishing Conditioner; New Look! Herbal Gro Conditioner; and Daily Control Anti-Dandruff Conditioner. Plaintiff reserves the right to include additional products into the definition of "Products" alleged herein based upon further findings in discovery.

and Class Members, the Products contain an ingredient or combination of ingredients that causes significant hair loss and/or scalp irritation upon proper application. At least one ingredient in the Products, DMDM hydantoin, is a formaldehyde donor known to slowly leach formaldehyde when coming into contact with water.

3.      Formaldehyde is a well-known human carcinogen that can cause cancer and other harmful reactions when absorbed into skin. DMDM hydantoin has been used as a preservative in Straight Arrow's products for well over a decade; however, the use of DMDM hydantoin as a preservative creates an entirely unnecessary risk because various safer natural alternatives exist. As such, the Products are rendered dangerous and unsafe for sale as over-the-counter ultra-cleansing and nourishing shampoo and conditioner products.

4.      Defendant failed to properly warn consumers of the risks and dangers attendant to the use of such a strong ingredient on their hair and scalp – even well after Defendant knew or should have known of the Products' hazards. Defendant continued to conceal the dangers of the Products by failing to appropriately and fully recall the Products, by continuing to claim the Products were safe when properly applied, and by failing to warn consumers of the dangers attendant to the Products' use.

5.      Defendant's uniform acts and omissions in connection with the development, marketing, sale and delivery of the Products violate state consumer protection laws, including those of the state of New York; constitute common law fraud; and unjustly enrich Defendant.

6.      Straight Arrow labeled, advertised, promoted and sold the Products targeting consumers who wanted to maintain and achieve hair that was long, luxurious, thicker, fuller, and/or healthier-looking.

7.      The Products are marketed in large bold font on the Products' front labels and

2

include representations such as, "For Renewed, Silkier Feel"; a "New Look"; "Natural";

"Nourishes and Strengthens"; "Gentle Clarifying"; "Gentle Replenishing"; "Daily Control";

"Olive Oil & Keratin"; "Relieves Itching & Flaking"; and/or "Moisturizes Hair & Scalp" (as

seen below).



8.      Through its labeling and an extensive marketing campaign, including through

its website and online advertisements, Straight Arrow made a number of affirmative

misrepresentations, including that the Shampoo and Conditioner Products contain:

      a.   A "gentle cleansing and purifying formula designed to remove excess build-
         up without drying or stripping the hair for a renewed, healthier look and

feel";

b.  A "light, replenishing formula designed to restore, revitalize and recondition for a renewed, silkier, healthier look and feel";

c.  A "formula with natural herbs blended with an olive oil complex to nourish, strengthen, and fortify hair from root to tip"; or

d.  "An advanced, nourishing and fortifying formula that helps prevent flakes while improving hair and scalp health."

9.     However, the Products' formula contains an ingredient, or combination of ingredients, that has caused Plaintiff and thousands of consumers to experience hair loss and/or scalp irritation.

10.     DMDM hydantoin is found, *inter alia*, in the following Mane 'n Tail Shampoo and Conditioner Products (Gentle Clarifying Shampoo, Gentle Replenishing Conditioner, New Look! Herbal Gro Conditioner, and Daily Control Anti-Dandruff Conditioner) as stated on the Products' back labels:





11.     In fact, for approximately a decade, Straight Arrow has known or should have known that DMDM hydantoin can cause or contribute to hair loss and scalp irritation when used as a preservative in hair products, including shampoo and conditioner products.

12.     Still, for nearly a decade, Straight Arrow has continued to market, sell and profit off of the Products that contain ingredients they knew could harm consumers.

13.     Straight Arrow knew that consumers were concerned about the safety of its

products, as evidenced by one of consumers' "Frequently Asked Questions" on its website[2]:

## ❌ Are Mane 'n Tail® products safe for human use?

The Original Mane 'n Tail Shampoo, The Original Mane 'n Tail Conditioner and Mane 'n Tail Hoofmaker Hand & Nail Therapy can be used safely on humans as well as animals.

As Straight Arrow has grown over the past 40 years, our product line has expanded to include products specifically developed for both humans and animals, but our consumers continue cross-over use of many of our products! Those products that have instructions for both horses and humans are safe to use for both.

Straight Arrow uses only approved high quality ingredients in our products which we are proud to market under the Mane 'n Tail brand. You will find personal care and animal care product information on our website as well as on individual product labels.

---

[2] https://manentailequine.com/faqs/. (Last Accessed September 15, 2021).

14.     Despite having public knowledge since at least 2012 that DMDM hydantoin, as a formaldehyde donor, can cause or contribute to hair loss and scalp irritation, Straight Arrow has inexplicably continued to include this ingredient as a preservative in some of its Mane 'n Tail products while simultaneously ***not*** using DMDM hydantoin as a preservative in many of its other Mane 'n Tail products.

15.     Although Straight Arrow was, or should have been, aware of the high potential for toxicity or allergic reaction caused by one or more of the ingredients in the Mane 'n Tail Products, it has continuously failed to warn consumers about possible reactions, including hair loss and scalp irritation, on any of the Mane 'n Tail Products' labeling.

16.     Nowhere on the package labeling or on Straight Arrow's websites or other marketing materials did Straight Arrow warn Plaintiff and members of the Class that they were at risk of significant hair loss and/or scalp irritation upon proper application of the products. Accordingly, Straight Arrow misled and deceived the public, and placed its customers in harm's way, all for the sake of increased profits.

17.     U.S. consumers do not reasonably expect their hair products to cause significant hair loss and/or scalp irritation as a result of defective design and manufacturing or because of inadequate research or due diligence. In addition, U.S. consumers had no expectation that the Mane 'n Tail Products would or could cause scalp irritation and/or cause their hair to fall out.

18.     Further, consumers reasonably expect that if Straight Arrow, the company primarily responsible for developing, manufacturing, marketing and distributing the Mane 'n Tail Products, knew that the Mane 'n Tail Products would or could cause irritation and/or hair loss (whether by proper application or by misapplication), Straight Arrow would make a disclosure to consumers as soon as it determined there was a widespread problem, rather than

attempting to conceal the problem. By downplaying, concealing and misrepresenting the Products and the safety and risks of their use, Straight Arrow failed in its duty to provide consumers with adequate information. Straight Arrow continued to create and perpetuate a false public perception that there was little or no risk of harm from the use of its Mane 'n Tail Products despite knowing of the Products' dangers.

19.     Defendant manufactures, advertises, markets, distributes, and sells the Mane 'n Tail Products throughout the United States, including in the state of New York.

20.     As alleged with specificity herein, Straight Arrow labeled, advertised, promoted and sold the Mane 'n Tail Products, using an extensive, uniform, nationwide advertising and marketing campaign. Specifically, they marketed the Products to consumers who wanted hair care solutions that help to maintain and achieve long, luxurious, thicker, fuller, healthier-looking hair. Through this extensive marketing campaign and via its Mane 'n Tail website and packaging, Straight Arrow made a number of affirmative misrepresentations, including that the Products were formulated to restore, revitalize, recondition, refreshen, nourish, fortify, moisturize, strengthen, and/or clean hair from root to tip in order to obtain the desired results.

21.     However, at all times relevant to this action, Straight Arrow knew but failed to disclose to Plaintiff and the putative Class that its product representations were false and misleading, because there was a danger of hair loss and/or scalp irritation caused by one or more ingredients in the Products, including the formaldehyde donor ingredient DMDM hydantoin.

22.     Defendant failed to properly warn consumers of the risks and dangers attendant to the use of such a strong preservative and human toxicant on their hair and scalp – even well after Defendant knew or should have known of its hazards. Defendant continued to conceal the dangers of the Products by failing to either recall or reformulate the Products.

23.     As a result of Defendant's misconduct and misrepresentations, Plaintiff and putative Class Members have suffered injury in fact, including economic damages.

24.     Plaintiff brings this suit to halt the unlawful sales and marketing of the Products by Defendant and for economic damages she sustained as a result. Given the massive quantities of the Products sold all over the country, this class action is the proper vehicle for addressing Defendant's misconduct and for attaining needed relief for those affected.

## PARTIES

25.     Plaintiff Brenda Ryan is and was at all times relevant to this matter a resident of the state of New York residing in Manhattan, which is in New York County.

26.     Defendant Straight Arrow is a corporation organized, existing, and doing business under and by virtue of the laws of the state of New Jersey, with its office and principal place of business located at 2020 Highland Ave., Bethlehem, Pennsylvania 18020. At all times Straight Arrow manufactured, marketed, designed, promoted and/or distributed the Products nationwide, including in New York.

## JURISDICTION AND VENUE

27.     This Court has personal jurisdiction over Defendant in this matter. The acts and omissions giving rise to this action occurred in the state of New York. Defendant has been afforded due process because it has, at all times relevant to this matter, individually or through its agents, subsidiaries, officers and/or representatives, operated, conducted, engaged in and carried on a business venture in this state and/or maintained an office or agency in this state, and/or marketed, advertised, distributed and/or sold products, committed a statutory violation within this state related to the allegations made herein, and caused injuries to Plaintiff and putative Class Members, which arose out of the acts and omissions that occurred in the state of

New York, during the relevant time period, at which time Defendant was engaged in business activities in the state of California.

28.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C.§ 1332 of the Class Action Fairness Act of 2005 because: (i) there are 100 or more putative Class Members, (ii) the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs, and (iii) there is minimal diversity because at least one Plaintiff and Defendant are citizens of different states. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

29.     Pursuant to 28 U.S.C. § 1391(a), venue is proper because a substantial part of the events giving rise to the claims asserted occurred in this District. Venue is also proper pursuant to 28 U.S.C. § 1391(c) because Defendant conducts substantial business in this District, has sufficient minimum contacts with this District, and otherwise purposely avails itself of the markets in this District, through the promotion, sale, and marketing of the Products in this District. Plaintiff also resides in this District.

## **FACTS COMMON TO ALL CLASS MEMBERS**

**A.  Straight Arrow's Business.**

30.     For decades, Straight Arrow has sold its Mane 'n Tail line of hair, skin and nail care products, namely shampoo, conditioner, detangler, styling preparation, spray, gel, reconstructing conditioners, dressings, hand, nail and body cremes and nail care preparations, non-medicated, nonveterinary grooming preparations for animals, namely hair, coat and skin shampoo and conditioner, and medicated hair, coat and skin shampoo and conditioner for use by humans or domesticated animals; Topical analgesics for use by humans or domesticated animals; and Pharmaceutical preparations for the treatment of skin conditions associated with

pathogenic microorganisms in horses.

31.     Straight Arrow boasts that its "Original formula Mane 'n Tail Shampoo and its companion conditioner have been a best kept secret for beauty aficionados everywhere."[3]

32.     As stated on its website, Straight Arrow was born when the Katzev family created Original Mane 'n Tail Shampoo and Conditioner on their family horse farm. The products were specifically targeted for show horses with long flowing manes and tails. The formulas quickly gained popularity with equestrians for use on their horses.

33.     According to Defendant, the Products "reached iconic status when the equestrian audience started using the shampoo and conditioner that they used on their horses, on themselves!"[4]

34.     The Mane 'n Tail product line expanded from its original shampoo and conditioner to now include multiple shampoos, conditioners, an all-in-one, leave-in treatments, styling/finishing aids and hand & nail treatments, including the shampoo and conditioner Products which are the subject of this action.

35.     Straight Arrow represents that its Mane 'n Tail Products include a "shampoo formula [that] contains high lathering and ultra-cleansing agents that are fortified with moisturizers and emollients to help leave hair soft and ultra clean."[5]

36.     Straight Arrow also represents that its Mane 'n Tail products "can be used safely on humans as well as animals."[6]

37.     In addition, Defendant touts that "Straight Arrow uses only approved high quality

---

[3] https://manentail.com/about/. (Last Accessed September 15, 2021).
[4] *Id.*
[5] *Id.*
[6] https://manentail.com/faqs/. (Last Accessed September 15, 2021).

ingredients in our products which we are proud to market under the Mane 'n Tail brand."[7]

38.     Defendant also represents that its "quality formulas help achieve and maintain longer, stronger, healthier looking hair by nourishing, fortifying and conditioning the hair and scalp."[8]

39.     Plaintiffs, Class Members, and reasonable consumers would understand from Defendant's product representations and marketing that the Products, through their claimed impact on hair, independently and in conjunction with the other marketing and labeling claims, provide natural, nourishing, and moisturizing properties rather than scalp irritation, hair breakage, and hair loss caused by the DMDM hydantoin.

**B.  The Dangers and Risks of Using Shampoos Containing DMDM Hydantoin.**

40.     There are numerous preservatives that are used in cosmetics and hair products, many of which have been linked to the development of allergies, dermatitis, hair loss, and even cancer. Formaldehyde donors are one such preservative.

41.     Formaldehyde donors are "added to water-containing cosmetics (which includes personal care products/toiletries) to prevent the growth of micro-organisms that may enter during manufacture or during their usage."[9]

42.     Despite having intimate knowledge of the risks of using formaldehyde donor preservatives since at least 2012, Straight Arrow continues to use formaldehyde donors, including DMDM hydantoin (also known as DMDM-h) and sodium hydroxyl, in its Mane 'n Tail Products.

---

[7] *Id.*

[8] *Id.*

[9] de Groot AC, White IR, Flyvholm MA, Lensen G, Coenraads PJ. Formaldehyde-releasers in cosmetics: relationship to formaldehyde contact allergy. Part 1. Characterization, frequency and relevance of sensitization, and frequency of use in cosmetics. Contact Dermatitis. 2010 Jan;62(1):2-17. doi: 10.1111/j.1600-0536.2009.01615.x. PMID: 20136875.

43.   "DMDM hydantoin (dimethylodimethyl hydantoin) is a formaldehyde donor used as a preservative in cosmetic products at concentrations up to 1%."[10] In other words, it is a formaldehyde-releasing preservative ("FRP") used to lengthen the shelf life of personal care products, including hair products.

44.   Humans can be exposed to formaldehyde by contact with the skin, and the use of cosmetics containing FRP is a significant source of exposure.[11]

45.   In personal care products, such as shampoo, formaldehyde is released from preservatives such as DMDM hydantoin, which release small amounts of formaldehyde over time.[12]

46.   "In 1984, DMDM hydantoin ranked 9th in the list of the most frequently used cosmetic preservatives in the USA."[13] By 1987, DMDM hydantoin (or "DMDMH") was included in approximately 115 product formulas filed with the FDA, appearing most frequently in shampoos.[14]

47.   The North American Contact Dermatitis Group ("NACDG") Standard Series is a screening method for diagnosing a contact allergy. From 2005-2006, "DMDMH was the 21st most common allergen" diagnosed using the NACDG Standard Series.[15]

48.   For many decades, dating back to at least the 1970s, studies and patch tests were

---

[10] "Patch test reactivity to DMDM hydantoin, Relationship to formaldehyde allergy." By Anton C. DeGroot, Theodoor Van Joost, Jan D. Bos, Harrie L.M. Van Der Meeren, and J. Willem Weyland (*Contact Dermatitis*, 1988, 18:197-201).

[11] De Groot AC, *supra* note 15.

[12] http://www.safecosmetics.org/get-the-facts/chemicals-of-concern/formaldehyde/ (Last Accessed September 15, 2021).

[13] "Patch test reactivity to DMDM hydantoin, Relationship to formaldehyde allergy." By Anton C. DeGroot, Theodoor Van Joost, Jan D. Bos, Harrie L.M. Van Der Meeren, and J. Willem Weyland (Contact Dermatitis, 1988, 18:197-201).

[14] *Id.*

[15] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2958195/ (citing Rietschel RL, Fowler JF., Jr . Fisher's Contact Dermatitis. 5th ed. Philadelphia: Lippincott Williams & Wilkins; 2001).

being performed to determine human reactivity to DMDM hydantoin,[16] including specifically

the "relationship between contact allergy to formaldehyde."[17]

49.    One study performed in 1987 specifically examined "whether the presence of

DMDM hydantoin in cosmetics may cause adverse effects in patients pre-sensitized to

formaldehyde."[18] The study concluded that "aqueous solutions of DMDM hydantoin, in

concentrations comparable to those used in cosmetic products, contain enough free

formaldehyde to cause dermatitis…," and that despite earlier conclusions that DMDM

hydantoin is a safe cosmetic ingredient, "data suggest that an increase in the use of this

preservative may also increase the risk of cosmetic dermatitis in patients allergic to

formaldehyde."[19] The authors further recommended that cosmetic products with FRPs should

have warnings that the products "'contain formaldehyde'… whether present as free

formaldehyde or bound by a donor."[20]

50.    Several more recent studies, including as recently as 2015, have "determined that

longer storage time and higher temperature increase the amount of formaldehyde released from

FRPs and could ultimately lead to more severe health concerns."[21]

51.    In other words, "reactions that generated formaldehyde occur silently as the

---

[16] Tudela E, MacPherson C, Maibach HI. Long-term trend in patch test reactions: a 32-year statistical overview (1970-2002), part II. Cutan Ocul Toxicol. 2008;27(3):187-202. doi: 10.1080/15569520802143436. PMID: 18988088.
[17] "Patch test reactivity to DMDM hydantoin, Relationship to formaldehyde allergy." By Anton C. DeGroot, Theodoor Van Joost, Jan D. Bos, Harrie L.M. Van Der Meeren, and J. Willem Weyland (Contact Dermatitis, 1988, 18:197-201).
[18] Id.
[19] Id.
[20] Id.
[21] http://www.safecosmetics.org/get-the-facts/chemicals-of-concern/formaldehyde/ (Last Accessed September 15, 2021) (citing Lv, C., Hou, J., Xie, W., & Cheng, H. (2015). Investigation on formaldehyde release from preservatives in cosmetics. International journal of cosmetic science.).

products sit on shelves in stores or bathroom cabinets."[22]

52.     In June 2011, the National Toxicology Program, an interagency program of the Department of Health and Human Services, named formaldehyde as a known human carcinogen in its *12th Report on Carcinogens.*[23]

53.     The International Agency for Research on Cancer has also classifies formaldehyde as a human carcinogen.[24]

54.     In 2009, prior to the sale of the Products, "a review of the literature on occupational exposures and formaldehyde shows a link between formaldehyde and leukemia."[25]

55.     With specific regard to FRPs, like DMDM hydantoin, "the formaldehyde released from FRPs has been linked to cancer, but there is little evidence that FRPs directly cause cancer. However, a mixture of the FRP bromopol and amines, which form nitrosamines, has been found to penetrate skin and cause cancer."[26]

56.     Further, a study in 2010 concluded that although "[i]t has been long accepted that formaldehyde-releaser sensitization is attributable to released formaldehyde. However, clinical studies show the existence of patients allergic to formaldehyde-releasers but not to

---

[22] https://www.ewg.org/research/exposing-cosmetics-cover#formaldehyde (Last Accessed September 15, 2021).
[23] National Toxicology Program (June 2011). Report on Carcinogens, Twelfth Edition. Department of Health and Human Services, Public Health Service, National Toxicology Program. (Last Accessed on May 17, 2021 from: http://ntp.niehs.nih.gov/go/roc12.)
[24] http://www.safecosmetics.org/get-the-facts/chemicals-of-concern/formaldehyde/ (Last Accessed September 15, 2021) citing International Agency for Research on Cancer. "IARC classifies formaldehyde as carcinogenic to humans." Press release. June 15, 2004. Accessed January 9, 2009.).
[25] http://www.safecosmetics.org/get-the-facts/chemicals-of-concern/formaldehyde/ (Last Accessed September 15, 2021)( Zhang et al 2009. Meta-analysis of formaldehyde and hematologic cancers in humans. Mutation Research 681: 150-168).
[26] http://www.safecosmetics.org/get-the-facts/chemicals-of-concern/formaldehyde/ (Last Accessed September 15, 2021)(citing to http://www.cosmeticsinfo.org/nitrosamines. Accessed September 23, 2015).

formaldehyde itself."[27] That same study found DMDM hydantoin to be "reactive per se."

57.     DMDM hydantoin is considered by the U.S. Food & Drug Administration as one of the most frequent sources of allergic reactions from the use of cosmetic products.[28]

58.     DMDM hydantoin may cause allergic reactions by triggering the immune system to release chemical substances such as antibodies, resulting in reactions such as itchiness, red rashes on the skin, or more extreme reactions.[29]

59.     Further, as a person becomes more exposed to an irritant over time, including DMDM hydantoin, the likelihood and severity of the reaction increase. This is called irritant contact dermatitis ("ICD"). ICD "can occur in any person if the amount and duration of irritant exposure are sufficient to cause direct epidermal keratinocyte damage."[30]

60.     Likewise, the irritation of the scalp, including dermatitis, has been linked to hair brittleness and hair loss.

61.     Like many other beauty manufacturers, Straight Arrow has been using DMDM hydantoin as a preservative in its products since before 2011. While many manufacturers; and moved away from toxic ingredients, including DMDM hydantoin, starting in 2012, Straight Arrow continues to use this formaldehyde donor in various Mane 'n Tail branded Products.

62.     As Straight Arrow is aware, there is a litany of alternative preservatives that can be used in shampoos and cosmetics that do not release known human carcinogens and are non-

---

[27] Kireche M, Gimenez-Arnau E, Lepoittevin JP. Preservatives in cosmetics: reactivity of allergenic formaldehyde-releasers towards amino acids through breakdown products other than formaldehyde. Contact Dermatitis. 2010 Oct;63(4):192-202. doi: 10.1111/j.1600-0536.2010.01770.x. Epub 2010 Aug 20. PMID: 20731691.

[28] https://www.fda.gov/cosmetics/cosmetic-ingredients/allergens-cosmetics (Last Accessed September 15, 2021).

[29] https://www.fda.gov/cosmetics/cosmetic-ingredients/allergens-cosmetics (Last Accessed September 15, 2021).

[30] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2958195/.

synthetic, including:

    a.  Glyoxylic acid (or derivatives thereof);

    b.  Potassium sorbate and sorbic acid;

    c.  Citric acid and its salts;

    d.  Rosemary oil extract;

    e.  Neem oil extract;

    f.  Lavender oil;

    g.  Grapefruit seed extract;

    h.  Vinegars; and

    i.  Others.

63.    Even if Straight Arrow had used lower levels of DMDM hydantoin, it would not have mitigated the risk of consumers developing and/or exacerbating sensitivity or allergic reaction, as such risk would still exist through repeated and prolonged use.

**C. Straight Arrow's Misrepresentations Regarding the Mane 'n Tail Products.**

64.    Defendant's Products are sold directly by Straight Arrow directly and through its authorized retailers to consumers nationwide, including in New York.

65.    The front labels of the Mane 'n Tail Products contain the following representations: "For Renewed, Silkier Feel"; a "New Look"; "Natural"; "Nourishes and Strengthens"; "Gentle Clarifying"; "Gentle Replenishing"; "Daily Control"; "Olive Oil & Keratin"; "Relieves Itching & Flaking"; and/or "Moisturizes Hair & Scalp" (as seen in paragraph 7 herein).

66.    Plaintiff and the Class did not and would not expect that application of the Products would or could cause hair loss and scalp irritation upon proper application.

17

67.     Plaintiff and the Class reasonably expected Defendant would not make false product representations given the potential hazard to consumers, especially because the Food, Drug and Cosmetic Act regulations provide that cosmetics that may be hazardous to consumers must bear appropriate warnings.[31]

68.     Straight Arrow continues to advise consumers that these Products are safe to use as directed, without providing any disclosure concerning the complaints of hair loss and with no warnings regarding the hair loss that may result from their continued use. Indeed, despite Straight Arrow's knowledge and awareness of the problems, risks, and dangers associated with DMDM hydantoin and the significant hair loss and breakage caused by the Products, Straight Arrow continued to sell the Products as natural, moisturizing, restoring, replenishing, and in other such ways which were false and misleading.

69.     Plaintiffs, Class Members, and reasonable consumers would understand from Defendant's product representations and marketing that the Products, through their claimed impact on hair, independently and in conjunction with the other marketing and labeling claims, provide natural, nourishing, and moisturizing properties rather than scalp irritation, hair breakage, and hair loss caused by the DMDM hydantoin.

70.     The Products are marketed and sold at retail stores such as CVS, Target, Walgreens, Sally Beauty, and Walmart, and through e-commerce websites such as Amazon.com, CVS.com, Target.com, Walgreens.com, Sallybeauty.com, and Walmart.com. In addition, Straight Arrow sells the Products direct to consumer through its website: https://manentail.com/products/.

---

[31] *See* https://www.fda.gov/cosmetics/cosmetics-labeling/cosmetics-labeling-claims (Last Accessed September 15, 2021).

71.     Defendant manufactures, advertises, markets, distributes and sells the Products in several sizes throughout the United States, including in New York. The Products are offered/available in 5.5 fluid ounces, 6 fluid ounces, 12 fluid ounces, 16 fluid ounces, 27.05 fluid ounces, and/or 32 fluid ounces.

**D.  Defendant's False and Deceptive Advertising and Labeling of the Products.**

72.     In violation of 21 U.S.C. § 362(a) and 21 C.F.R. § 701.1(b), Defendant has consistently, falsely and deceptively advertised and labeled the Products in an effort to make consumers believe that the Products' ingredients, including DMDM hydantoin, were safe for use.

73.     Since launching the Products, Defendant has consistently conveyed its uniform, deceptive message to consumers throughout the United States, including the state of New York, that the Products formulated with formaldehyde donors, including DMDM hydantoin, are safe for use.

74.     These uniform deceptive claims have been made and repeated across a variety of media including Defendant's Products' labels, websites and online promotional materials, and at the point-of-purchase, where they are made obvious to consumers. In truth, Defendant's claims that DMDM hydantoin is a safe ingredient are false, misleading, and deceptive because the Products' ingredients, including DMDM hydantoin, are not "safe and gentle for all hair types", cause serious scalp irritation and hair loss, and do not help reduce the incidence of itchy and flaking scalp, nor do they provide essential hydration to help achieve shiny, soft, silky, and manageable hair.

75.     Upon information and belief, Straight Arrow knowingly permitted the manufacture and sale of the Products that were dangerous and unfit for sale as hair care solutions

that help to maintain and achieve long, luxurious, thicker, fuller, healthier-looking hair.

76.     Prior to placing the Products into the stream of commerce for sale to Plaintiff and the putative Class, Defendant was aware or should have been aware that the Products contained one or more unsafe ingredients, including DMDM hydantoin, that could cause significant hair loss and scalp irritation upon proper application and that any instructions and warnings provided with the Products directly to consumers were materially insufficient.

77.     Defendant knew, or but for its reckless indifference would have known, that: (a) the risk of scalp irritation and hair loss was substantial, if not a certainty, (b) Straight Arrow's customers were unaware of that substantial risk, and (c) those customers had a reasonable expectation that Straight Arrow would not sell the Products under those conditions.

78.     Despite such knowledge, Defendant did not disclose to prospective purchasers that its product representations were false because that there was a substantial risk of scalp irritation and hair loss associated with use of the Products. Defendant instead continued to claim that the Products' ingredients, including DMDM hydantoin, were safe.

79.     However, despite the representations that the Products are "hair care solutions" for helping to "maintain and achieve long, luxurious, thicker, fuller, healthier-looking hair," they contain one or more ingredients, including DMDM hydantoin, that is a known formaldehyde donor that can cause scalp irritation and hair loss.

80.     Defendant reinforces the false and deceptive claims that the Products "restore", "revitalize", "recondition", "refreshen", "nourish", "fortify", "moisturize", "strengthen" and/or "clean" hair from root to tip in order to achieve long, luxurious, thicker, fuller, healthier-looking hair through the websites of various authorized retailers and on its own website.

81.     Plaintiffs, Class Members, and reasonable consumers would understand from

Defendant's product representations and marketing that the Products, through their claimed impact on hair, independently and in conjunction with the other marketing and labeling claims, provide natural, nourishing, and moisturizing properties rather than scalp irritation, hair breakage, and hair loss caused by the DMDM hydantoin.

**E.  The Impact of Defendant's False, Misleading and Deceptive Advertising.**

82.    Defendant intended for consumers to rely upon the representations on the Products' labels, and reasonable consumers, including Plaintiff and the Class, did, in fact, so rely. These representations are often the only source of information consumers can use to make decisions concerning whether to buy and use such products.

83.    Consumers lack the ability to test or independently ascertain the genuineness of product claims of normal everyday consumer products, especially at the point-of-sale. Reasonable customers must therefore rely on consumer product companies, such as Defendant, to honestly represent their Products and the Products' attributes on the Products' labels.

84.    At all relevant times, Defendant directed the above-referenced Products' labels, statements, claims and innuendo – including that the Products help reduce incidence of itchy and flaking scalp, enhance softness and shine while reducing frizz, breakage, and split ends, and/or restore, revitalize, and recondition for a naturally clean scalp and healthy hair, and that the ingredients were safe (specifically, Defendant uses "only approved high quality ingredients" in its products) – to consumers in general and Plaintiff and all Class Members in particular, as evidenced by their eventual purchases of the Products.

85.    Plaintiff and Class Members did reasonably rely on Defendant's Product labels, statements, advertisements, claims and innuendo in deciding to purchase the Products and were thereby deceived.

86.     As a result of Defendant's deceptive labeling and/or marketing campaign, Defendant has caused Plaintiff and putative Class Members to purchase the Products, which contained one or more unsafe ingredients, including DMDM hydantoin, and do not safely (or at all) restore, revitalize, recondition, refreshen, nourish, fortify, moisturize, strengthen, and/or clean hair from root to tip.  Plaintiff and putative Class Members have been harmed, as they would not have purchased the Products had they known the Products were not safe and would or could cause scalp irritation and hair loss.

87.     As a result of Defendant's misconduct, Defendant was able to sell the Products to at least thousands of consumers throughout the United States— including Plaintiff and putative Class Members—and realized sizeable profits.

88.     Plaintiff and putative Class Members were harmed and suffered actual damages in that Plaintiff and putative Class Members did not receive the benefit of their bargain as purchasers of the Products, which were represented as safe and gentle for colored, permed, relaxed and chemically treated hair, and can help prevent breakage, frizz, and split ends, as well as restore, revitalize, and recondition for a naturally clean scalp and healthy hair, and/or nourish, strengthen, and fortify from root to tip. Indeed, Plaintiff and putative Class Members did not receive the benefit of their bargain after purchasing the Products, as Plaintiff and putative Class Members paid for Products that were unsafe, could cause scalp irritation and hair loss, and do not safely (or at all) restore, revitalize, recondition, refreshen, nourish, fortify, moisturize, strengthen, and/or clean hair from root to tip.

89.     Defendant developed and knowingly employed a labeling, advertising and/or marketing strategy designed to deceive consumers into believing that the Products contain only approved high quality and safe ingredients, and can restore, revitalize, recondition, refreshen

22

nourish, fortify, moisturize, strengthen, and/or clean hair from root to tip.

90.    The purpose of Defendant's scheme was to stimulate sales, engender public trust, and enhance Defendant's profits.

91.    As the manufacturers, marketers, advertisers, distributors and/or sellers of the Mane 'n Tail Products, Defendant possess specialized knowledge regarding the Products and the content of the ingredients contained therein. In other words, Defendant knew exactly what is – and is not – contained in the Mane 'n Tail Products, at what levels, and are safe or unsafe.

92.    Defendant knew or should have known, but failed to disclose that its product representations were false and misleading because that the Products contain one or more unsafe ingredients, including DMDM hydantoin, and do not safely (or at all) restore, revitalize, recondition, refreshen, nourish, fortify, moisturize, strengthen, and/or clean hair from root to tip, as labeled and/or marketed by Defendant.

93.    Plaintiff and putative Class Members were, in fact, misled by Defendant's labeling, representations and marketing of the Products.

94.    The unsafe ingredient(s) and the inability of the Products to safely (or at all) restore, revitalize, recondition, refreshen, nourish, fortify, moisturize, strengthen, and/or clean hair from root to tip, leave consumers, such as Plaintiff and the putative Class with no reason to purchase these Products at all, since other proven and safer comparably priced products exist.

95.    The Products are defined as "cosmetics" under 21 U.S.C.S. § 321(i) of the Federal Food Drug & Cosmetic Act ("FDCA").

96.    Defendant's deceptive statements violate 21 U.S.C.S. § 362(a), which deems a cosmetic product misbranded when the label contains a statement that is "false or misleading in any particular."

97.     Similarly, New York state law finds a cosmetic misbranded if "its labeling is false or misleading in any particular." NY Educ. L § 6818(2)(a).

98.     The FDA promulgated regulations for compliance with the FDCA at 21 C.F.R. §§ 701 *et seq*. (for cosmetics).

99.     The introduction of misbranded cosmetics into interstate commerce is prohibited under the FDCA and all parallel state statutes cited in this Complaint.

100.    Plaintiff and putative Class Members would not have purchased the Products had they known the Products contained one or more unsafe ingredients and are incapable of safely (or at all) restoring, revitalizing, reconditioning, refreshening, nourishing, fortifying, moisturizing, strengthening, and/or cleaning hair from root to tip.

101.    Plaintiffs, Class Members, and reasonable consumers would understand from Defendant's product representations and marketing that the Products, through their claimed impact on hair, independently and in conjunction with the other marketing and labeling claims, provide natural, nourishing, and moisturizing properties rather than scalp irritation, hair breakage, and hair loss caused by the DMDM hydantoin.

102.    Defendant will continue to commit the unlawful practices of selling the Products with DMDM hydantoin while representing them to have qualities that they do not because of the DMDM hydantoin, and Class Members will remain at an unreasonable risk of purchasing the Products and being harmed by the DMDM hydantoin. Plaintiff and Class Members would consider purchasing the Products again provided that it was formulated, designed, manufactured, and sold in such a way as to not contain formaldehyde donors such as DMDM hydantoin.

## PLAINTIFF'S FACTUAL ALLEGATIONS

103.   Plaintiff, Brenda Ryan, purchased the Mane 'n Tail branded Gentle Clarifying Shampoo most recently at American Outlet, a brick-and-mortar store, in Manhattan, New York on September 12, 2020 for approximately $4.99. Before purchasing the Product, Plaintiff reviewed information about the Product on the Product's labels and the fact that the Product was being sold for personal use, and not resale. At the time of purchasing the Product, Plaintiff also reviewed the accompanying disclosures and marketing materials, and understood them as representations made by Defendant that the Product: (i) contained a gentle cleaning and replenishing formula that restores, revitalizes and reconditions for a naturally clean scalp and healthy hair; (ii) was safe and gentle for color and chemically treated hair; (iii) helped to reduce incidence of flaking and itchy scalp; and (iv) provided a blend of essential oils, proteins and amino acids that nourishes and fortifies the hair for a more refreshed, clean, silky, moisturized feel. Plaintiff relied on these representations and in deciding to purchase Defendant's Product. Accordingly, these representations were part of the basis of the bargain, in that she would not have purchased the Product had she known these representations were not true. Here, Plaintiff did not receive the benefit of her bargain because Defendant's Product does not contain high quality and safe ingredients nor does it recondition, revitalize, restore, nourish, strengthen, or fortify hair for a renewed, silkier, healthier, and moisturized look and feel.

104.   Plaintiff purchased the Product because she wanted a naturally clean scalp and healthy hair, and to maintain and achieve long, luxurious, thicker, fuller, healthier-looking hair.

105.   Before using the Product, Plaintiff followed the instructions on the Product's labels, as directed by Defendant.

106.   Shortly after using the Product as intended by Defendant, Plaintiff noticed intense

scalp irritation, scalp burns, constant itching, and hair loss, which resulted in massive bald spots on her head.

107.   Plaintiff used the Product for approximately two months before she stopped using the Product.

108.   Once Plaintiff stopped using the Product, her hair loss and/or scalp irritation side effects slowly started to diminish.

109.   Plaintiff reasonably expected that the Product she purchased would and could not cause scalp irritation or hair loss. Further, Plaintiff reasonably expected that if Straight Arrow, the company primarily responsible for developing, manufacturing, marketing and distributing the Mane 'n Tail Products, knew or should have known that the Product would or could cause hair loss, Straight Arrow would make a disclosure to consumers as soon as it determined there was a widespread problem, rather than attempting to conceal the problem.

110.   As a result of Straight Arrow's concealment, misrepresentations and omissions, Plaintiff purchased the Product. Had Plaintiff known the true nature of the Product, she would not have purchased the Product or would have paid less for the Product.

111.   Defendant was provided reasonable notice of her claims via notice letter served on Defendant's agent, Catherine D. Penyak, VP of Straight Arrow Products, Inc., on May 20, 2021, pursuant to N.Y. U.C.C. § 2-607(3)(a).

### ESTOPPEL FROM PLEADING AND
### TOLLING OF APPLICABLE STATUTES OF LIMITATIONS

112.   Plaintiff and members of the putative Classes are within the applicable statute of limitation for the claims presented here. Defendant had knowledge and information detailing the Products' propensity to cause or contribute to hair loss and/or scalp irritation, and this information was unknown to consumers. Plaintiff and members of the putative Classes,

therefore, could not reasonably have known that the Products would cause or contribute to hair loss and scalp irritation. Rather, consumers relied upon Defendant's misrepresentations and omissions, including the statements on the Products' labeling as set forth above.

113.   Once Plaintiff incurred damages, she promptly acted to preserve her rights, filing this action. Defendant is estopped from asserting any statute of limitation defense that might otherwise be applicable to the claims asserted herein.

## CLASS ACTION ALLEGATIONS

114.   Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein.

115.   Plaintiff brings this action individually and on behalf of all other persons similarly situated pursuant to Federal Rule of Civil Procedure 23. The class definition(s) may depend on the information obtained throughout discovery. Notwithstanding, at this time, Plaintiff brings this action and seeks certification of the following proposed Classes:

> **National Class**:   All persons or entities within the United States who purchased the Products from the beginning of any applicable limitations period through the date of class certification (the "National Class" or the "Class").

> **Consumer Fraud Multi-State Class**:   All persons or entities in the States of California, Florida, Illinois, Massachusetts, Michigan, Minnesota, Missouri, New Hampshire, New Jersey, New York, Rhode Island, Washington and Wisconsin who purchased the Products from the beginning of any applicable limitations period through the date of class certification (the "Consumer Fraud Multi-State Class").[32]

> **New York Sub-Class**:   All persons or entities in New York who purchased the Products from the beginning of any applicable limitations period through the date of class certification (the "New York Sub-Class").

---

[32] The States in the Consumer Fraud Multi-State Class are limited to those States with similar consumer fraud laws under the facts of this case: California (Cal. Bus. & Prof. Code §17200, *et seq.*); Florida (Fla. Stat. §501.201, *et seq.*); Illinois (815 Ill. Comp. Stat. 505/1, *et seq.*); Massachusetts (Mass. Gen. Laws Ch. 93A, *et seq.*); Michigan (Mich. Comp. Laws §445.901, *et seq.*); Minnesota (Minn. Stat. §325F.67, *et seq.*); Missouri (Mo. Rev. Stat. §407.010, *et seq.*); New Jersey (N.J. Stat. §56:8-1, *et seq.*); New York (N.Y. Gen. Bus. Law §349, *et seq.*); and Washington (Wash. Rev. Code §19.86.010, *et seq.*).

116.   Excluded from the proposed Classes are the Defendant, and any entities in which the Defendant has a controlling interest, any Judge to whom this action is assigned and any member of such Judge's staff and immediate family, and Plaintiff's counsel, their staff members, and their immediate family.

117.   Plaintiff reserves the right to amend the Class definitions or add a Class if further information and discovery indicate that the Class definitions should be narrowed, expanded, or otherwise modified.

118.   Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of its claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

119.   **Numerosity – Federal Rule of Civil Procedure 23(a)(1).**  The members of the Classes are so numerous that their individual joinder herein is impracticable. On information and belief, members of the Classes number in the thousands to hundreds of thousands. The number of members of the Classes is presently unknown to Plaintiff but may be ascertained from Defendant's books and records. Members of the Classes may be notified of the pendency of this action by mail, email, Internet postings, and/or publication.

120.   **Commonality and Predominance – Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3).** Common questions of law and fact exist as to all members of the Classes and predominate over questions affecting only individual members of the Classes. Such common questions of law or fact include, but are not limited to, the following:

a.   Whether Defendant had a reasonable basis for claiming the misrepresentations stated herein;

b.   Whether the marketing, advertising, packaging, labeling, and other

promotional materials for the Products are deceptive;

   c.   Whether Defendant's actions violate the state consumer fraud statutes invoked below;

   d.   Whether Defendant's actions constitute common law fraud;

   e.   Whether Plaintiff and the members of the Classes were damaged by Defendant's conduct;

   f.   Whether Defendant was unjustly enriched at the expense of Plaintiff and Class Members;

   g.   Whether Plaintiff and Class Members are entitled to injunctive relief.

121.   Defendant engaged in a common course of conduct giving rise to the legal rights Plaintiff seeks to enforce, on behalf of herself and the other Members of the proposed Classes. Similar or identical statutory and common law violations, business practices, and injuries are involved. Individual questions, if any, pale in comparison, in both quality and quantity, to the numerous common questions that dominate this action.

122.   **Typicality – Federal Rule of Civil Procedure 23(a)(3).** Plaintiff's claims are typical of the claims of the other Members of the Classes because, among other things, all Members of the Classes were comparably injured through Defendant's uniform misconduct described above. Further, there are no defenses available to Defendant that are unique to Plaintiff or to any particular Members of the Classes.

123.   **Adequacy of Representation – Federal Rule of Civil Procedure 23(a)(4).** Plaintiff is an adequate Class representative because its interests do not conflict with the interests of the other Members of the Classes it seeks to represent; she has retained counsel

competent and experienced in complex class action litigation; and she will prosecute this action vigorously. The Classes' interests will be fairly and adequately protected by Plaintiff and the undersigned counsel.

124. **Insufficiency of Separate Actions – Federal Rule of Civil Procedure 23(b)(1).** Absent a representative class action, Members of the Classes would continue to suffer the harm described herein, for which they would have no remedy. Even if separate actions could be brought by individual consumers, the resulting multiplicity of lawsuits would cause undue burden and expense for both the Court and the litigants, as well as create a risk of inconsistent rulings and adjudications that might be dispositive of the interests of similarly situated purchasers, substantially impeding their ability to protect their interests, while establishing incompatible standards of conduct for Defendant. The proposed Classes thus satisfy the requirements of Fed. R. Civ. P. 23(b)(1).

125. **Declaratory and Injunctive Relief – Federal Rule of Civil Procedure 23(b)(2).** Defendant has acted or refused to act on grounds generally applicable to Plaintiff and the other Members of the Classes, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the members of the Classes as a whole. More specifically, Defendant will continue to commit the unlawful practices of selling the Products with DMDM hydantoin while representing them to have qualities that they do not because of the DMDM hydantoin, and Class Members will remain at an unreasonable risk of purchasing the Products and being harmed by the DMDM hydantoin. Plaintiff and Class Members would consider purchasing the Products again provided that it was formulated, designed, manufactured, and sold in such a way as to not contain formaldehyde donors such as DMDM hydantoin. Thus, Plaintiff seeks to certify a Class to enjoin Defendant from selling or otherwise

distributing the Products as labeled until such time that Defendant can demonstrate to the Court's satisfaction that the Products confer the advertised benefits.

126. **Superiority – Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiff and the other Members of the Classes are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be impracticable for Members of the Classes to individually seek redress for Defendant's wrongful conduct. Even if Members of the Classes could afford individual litigation, the court system could not. Individualized litigation would create a potential for inconsistent or contradictory judgments and increase the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## CAUSES OF ACTION

### COUNT I
**Breach of Express Warranty**
**N.Y. U.C.C. §2-313**
**(Plaintiff Individually and on Behalf of the New York Subclass)**

127. Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein.

128. Plaintiff Ryan brings this cause of action on behalf of herself and the New York Subclass against Defendant.

129. Plaintiff Ryan and New York Subclass Members purchased the Products either

directly from Defendant or through retailers such CVS, Target, Walgreens, Sally Beauty, and Walmart, and through e-commerce websites such as Amazon.com, CVS.com, Target.com, Walgreens.com, Sallybeauty.com, and Walmart.com, among others.

130.   Defendant is and was at all relevant times a "merchant(s)" under N.Y. U.C.C. §2-313.

131.   Defendant, as the formulator, designer, manufacturer, marketer, distributor, and/or seller expressly warranted that the Products were fit for their intended purpose by making the express warranties that the Products:

    a.   utilize "quality formulas help achieve and maintain longer, stronger, healthier looking hair by nourishing, fortifying and conditioning the hair and scalp."

    b.   are "Natural;"

    c.   "strengthen" hair;

    d.   "Moisturize(s) Hair & Scalp;"

    e.   "restore" hair;

    f.   "revitalize" hair;

    g.   "recondition" hair;

    h.   are "For Renewed, Silkier Feel;"

    i.   "Nourishes and Strengthens" hair;

    j.   are "Gentl(y) Clarifying;"

    k.   are "Gentl(y) Replenishing;"

    l.   are "hair care solutions" for helping to "maintain and achieve long, luxurious, thicker, fuller, healthier-looking hair,"

    m.   "Relieve(s) Itching & Flaking;"

> n.   "refreshen" hair;
>
> o.   "nourish" hair; and/or
>
> p.   "fortify" hair.

132.   Defendant made the foregoing express representations and warranties to all consumers, which became the basis of the bargain between Plaintiff Ryan, New York Subclass Members and Defendant.

133.   In fact, the Products are not fit for such purpose, did not comply with the foregoing representations, make hair weaker and not stronger, were not natural, did not renew or replenish, were incapable of restoring, nourishing, or fortifying hair because they contained the formaldehyde donor DMDM hydantoin, and thus, each of the express warranties is a false and misleading misrepresentation.

134.   Defendant breached these warranties and/or contract obligations by placing the Products into the stream of commerce and selling them to consumers, when the Products are not capable of meeting Defendant's warranties and representations given the harmful ingredient contained therein.

135.   The harmful ingredient which renders the warranties and representations false and misleading, existed when the Products left Defendant' possession or control and were sold to Plaintiff Ryan and New York Subclass Members. The harmfulness of DMDM hydantoin was not discoverable by Plaintiff Ryan and New York Subclass Members at the time of their purchase of the Products.

136.   Defendant was provided reasonable notice of the aforementioned breaches of the above-described warranties via notice letter served on Defendant's agent, Catherine D. Penyak, VP of Straight Arrow Products, Inc., on May 20, 2021, pursuant to N.Y. U.C.C. § 2-607(3)(a).

137.   Plaintiff Ryan and the New York Subclass Members were injured as a direct and proximate result of Defendant's breach because they would not have purchased the Products if they had known the truth about the Products.

138.   Defendant breached express warranties about the Products and their qualities because Defendant's warranties and statements about the Products were false and misleading, and the Products could not conform to those warranties and statements because they contained the harmful ingredient DMDM hydantoin. Plaintiff and the New York Subclass Members relied on Defendant's representations and would not have purchased the Products had they known the true nature of the Products and the mis-statements regarding what the Products were and what they contained.

139.   As a result of Defendant's breach of warranty, Plaintiff and the Class have been damaged in the amount of the purchase prices of the Products and any other damages allowable by law.

**COUNT II**
**Breach of Contract/Common Law Warranty**
**(Plaintiff Individually and on Behalf of the New York Subclass)**

140.   Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein.

141.   Plaintiff Ryan brings this cause of action on behalf of herself and the New York Subclass against Defendant.

142.   To the extent Defendant's commitment is deemed not to be a warranty under New York's Uniform Commercial Code, Plaintiff Ryan pleads in the alternative under common law warranty and contract law.

143.   Plaintiff Ryan and New York Subclass Members purchased the Products either

directly from Defendant or through retailers such as CVS, Target, Walgreens, Sally Beauty, and Walmart, and through e-commerce websites such as Amazon.com, CVS.com, Target.com, Walgreens.com, Sallybeauty.com, and Walmart.com, among others.

144.    Defendant expressly warranted that the Products were fit for their  intended purpose in that the Products utilize "quality formulas help achieve and maintain longer, stronger, healthier looking hair by nourishing, fortifying and conditioning the hair and scalp;" are "Natural, "strengthen" hair, "Moisturize(s) Hair & Scalp," "restore" hair, "revitalize" hair, "recondition" hair, are "For Renewed, Silkier Feel," "Nourish(es) and Strengthen(s)" hair, are "Gentl(y) Clarifying, are "Gentl(y) Replenishing," are "hair care solutions" for helping to "maintain and achieve long, luxurious, thicker, fuller, healthier-looking hair," "Relieve(s) Itching & Flaking," "refreshen" hair," "nourish" hair; and/or "fortify" hair.

145.    Defendant made the foregoing express representations and warranties to all consumers, which became the basis of the bargain between Plaintiff Ryan, New York Subclass Members and Defendant.

146.    Defendant breached the warranties and/or contract obligation by placing the Products into the stream of commerce and selling them to consumers, when the Products do not have the properties they were represented to possess, and are incapable of possessing those properties when they contain the harmful ingredient DMDM hydantoin. As such, the Products are unfit for their intended use and purpose. The inclusion of DMDM hydantoin rather than more suitable, safer and more natural preservatives substantially and/or completely impairs the use and value of the Products.

147.    The harmful ingredient DMDM hydantoin existed when the Products left Defendant's possession or control and were sold to Plaintiff Ryan and New York Subclass

Members. The harmful effect of DMDM hydantoin that impaired the use and value of the Products were not discoverable by Plaintiff Ryan and New York Subclass Members at the time of their purchase of the Products.

148.     As a direct and proximate cause of Defendant's breach of contract, Plaintiff Ryan and the New York Subclass Members were harmed because they would not have purchased the Products if they had known the truth about the Products.

## COUNT III
### Violation of the State Consumer Fraud Acts
### (Plaintiff on Behalf of the Consumer Fraud Multi-State Class)

149.     Plaintiff incorporates by reference all of the foregoing paragraphs of this Complaint as if fully set forth herein.

150.     The Consumer Fraud Acts of the States in the Consumer Fraud Multi-State Class[33] prohibit the use of unfair or deceptive business practices in the conduct of trade or commerce.

151.     Plaintiff and the other Members of the Consumer Fraud Multi-State Class have standing to pursue a cause of action for violation of the Consumer Fraud Acts of the States in the Consumer Fraud Multi-State Class because Plaintiff and Members of the Consumer Fraud Multi-State Class have suffered an injury in fact and lost money as a result of Defendant' actions set forth herein.

152.     Defendant engaged in unfair and/or deceptive conduct by, *inter alia*, making representations about the Products, specifically that the Products would restore, revitalize, recondition, refreshen, nourish, fortify, moisturize, strengthen, and/or clean hair from root to

---

[33] The States in the Consumer Fraud Multi-State Class are limited to those States with similar consumer fraud laws under the facts of this case: California (Cal. Bus. & Prof. Code §17200, *et seq*.); Florida (Fla. Stat. §501.201, *et seq*.); Illinois (815 Ill. Comp. Stat. 505/1, *et seq*.); Massachusetts (Mass. Gen. Laws Ch. 93A, *et seq*.); Michigan (Mich. Comp. Laws §445.901, *et seq*.); Minnesota (Minn. Stat. §325F.67, *et seq*.); Missouri (Mo. Rev. Stat. §407.010, *et seq*.); New Jersey (N.J. Stat. §56:8-1, *et seq*.); New York (N.Y. Gen. Bus. Law §349, *et seq*.); and Washington (Wash. Rev. Code §19.86.010, *et seq*.).

tip.

153.   At all material times, Defendant engaged in a scheme of offering the Products for sale to Plaintiff and other Class Members through, *inter alia*, commercial marketing and advertising, the Internet, the Products' packaging and labeling, and other promotional materials and offers for sale for the Products. The conduct was undertaken by Defendant in transactions intended to result in, and which did result in, the sale of goods to consumers.

154.   As more fully described above, Defendant's misleading marketing, advertising, packaging, and labeling of the Products is likely to deceive reasonable consumers. Indeed, Plaintiff and the other Class Members were unquestionably deceived by the representations on the Products, stated above, as Defendant's marketing, advertising, packaging, and labeling of the Products misrepresent, and/or obfuscate the true facts concerning the benefits, nature, and quality of the Products.

155.   Defendant knew, or in the exercise of reasonable care should have known, that these representations were misleading and deceptive. Defendant acted willfully, wantonly, and with reckless disregard for the truth.

156.   Defendant intended that Plaintiff and each of the other Members of the Consumer Fraud Multi-State Class would rely upon its unfair and deceptive conduct and a reasonable consumer would in fact be misled by this deceptive conduct described above.

157.   Each of the Members of the Consumer Fraud Multi-State Class relied upon Defendant's unfair and deceptive conduct alleged herein in purchasing the Products.

158.   Plaintiff and other Class Members suffered a substantial injury by virtue of buying the Products that they would not have purchased absent Defendant's unlawful, fraudulent, and unfair marketing, advertising, packaging, and labeling, or by virtue of paying an excessive

premium price for the unlawfully, fraudulently, and unfairly marketed, advertised, packaged, and labeled Products.

159.   Plaintiff and other Class Members had no way of reasonably knowing that the Products they purchased were not as marketed, advertised, packaged, or labeled. Thus, they could not have reasonably avoided the injury each of them suffered.

160.   As a result of Defendant's use or employment of unfair or deceptive acts or business practices, Plaintiff and each of the other Members of the Consumer Fraud Multi-State Class have sustained damages in an amount to be proven at trial.

161.   In addition, Defendant's conduct showed malice, motive, and the reckless disregard of the truth such that an award of punitive damages is appropriate.

### COUNT IV
**(In the Alternative to Count III)**
**Violation of the New York Deceptive Trade**
**Practices Act, New York Gen. Bus. Law § 349, et seq.**
**(Plaintiff Individually and on behalf of the New York Sub-Class)**

162.   Plaintiff incorporates by reference all of the foregoing paragraphs of this Complaint as if fully stated herein.

163.   By reason of the acts set forth above, Defendant has been and is engaged in deceptive acts or practices in the conduct of a business, trade, or commerce in violation of New York's General Business Law § 349.

164.   Defendant engaged in unfair and/or deceptive conduct by, *inter alia*, making representations about the Products, specifically that the Products would restore, revitalize, recondition, refreshen, nourish, fortify, moisturize, strengthen, and/or gently clean hair from root to tip. Defendant's representations induced Plaintiff and the New York Subclass to purchase, purchase more of, and/or pay a higher price for the Products when they otherwise

would not have. As a result, Plaintiff and the New York Subclass have been injured by their purchase of the Products, which were worth less than what they bargained for and/or paid, and which they selected over other products that may have been truthfully marketed.

165.   The public is likely to be damaged because of Defendant's deceptive trade practices or acts. Specifically, Defendant's false, deceptive, or misleading statements implicate the purchasing decisions of those consumers deceived by Defendant.

166.   Defendant directs its conduct at consumers, as Defendant's false, deceptive, or misleading statements are contained in marketing targeted toward consumers, including its retail product packaging. As such, Defendant's conduct as alleged herein is consumer oriented.

167.   Defendant's deceptive acts are likely to mislead a reasonable consumer acting reasonably under the circumstances.

168.   Defendant's deceptive acts affect the public interest in the state of New York because, upon information and belief, consumers located in New York have purchased Defendant's Products in reliance on Defendant's false, deceptive, or misleading statements.

169.   As a result of Defendant's use or employment of unfair or deceptive acts or business practices, Plaintiff and each of the other Members of the New York Sub-Class have sustained damages in an amount to be proven at trial.

170.   For the foregoing reasons, Defendant is liable to Plaintiff and the New York Subclass for actual damages or $50 for each sale of a Product (whichever is greater), attorneys' fees, and the costs of this suit. The Court may, in its discretion, increase the award of damages to an amount up to three times the actual damages, up to $1,000, based on Defendant's willful and knowing violation of § 349.

**COUNT V**
**(In the Alternative to Count III)**
**Violation of the New York Deceptive Trade**
**Practices Act, New York Gen. Bus. Law § 350, et seq.**
**(Plaintiff Individually and on behalf of the New York Sub-Class)**

171.   Plaintiff repeats and re-alleges each of the allegations set forth in each of the paragraphs above in this Complaint and incorporates them by reference.

172.   Defendant has made material, false or misleading statements or representations of fact about the Products. Specifically, Defendant has literally, impliedly, or by necessary implication made the representations, specifically that the Products would restore, revitalize, recondition, refreshen, nourish, fortify, moisturize, strengthen, and/or gently clean hair from root to tip, none of which are true. Defendant's acts constitute false advertising in the conduct of business, trade, or commerce, or in the furnishing of any service in the state of New York in violation of New York's General Business Law § 350.

173.   Defendant's representations, as stated above, induced Plaintiff and the New York Subclass to purchase, purchase more of, and/or pay a higher price for the Products when they otherwise would not have. As a result, Plaintiff and the New York Subclass have been injured by their purchase of the Products, which were worth less than what they bargained for and/or paid, and which they selected over other products that may have been truthfully marketed.

174.   The public is likely to be damaged because of Defendant's deceptive trade practices or acts. Specifically, Defendant's false or misleading statements implicate the purchasing decisions of those consumers deceived by Defendant.

175.   As such, Defendant's conduct as alleged herein is consumer oriented.

176.   As a result of Defendant's material, false or misleading statements or representations of fact about the Products, Plaintiff and each of the other Members of the New

York Sub-Class have sustained damages in an amount to be proven at trial.

177.   For the foregoing reasons, Defendant is liable to Plaintiff and the New York

Subclass for actual damages or $500 for each sale of a Product (whichever is greater), attorneys'

fees, and the costs of this suit. The Court may, in its discretion, increase the award of damages

to an amount up to three times the actual damages, up to $10,000, based on Defendant's willful

and knowing violation of § 350.

## COUNT VI
### Fraud
**(Plaintiff Individually and on Behalf of the Nationwide and/or
Multi-State Class and/or the New York Sub-Class)**

178.   Plaintiff incorporates by reference all of the foregoing paragraphs of this

Complaint as if fully stated herein.

179.   Plaintiff brings this cause of action on behalf of herself, the Nationwide Class

and/or Multi-State Class and/or the New York Sub-Class against Defendant, Straight Arrow.

180.   As alleged herein, Defendant, Straight Arrow, knowingly made material

misrepresentations and omissions regarding the Mane 'n Tail Products on the Products' labeling

and packaging in the Products' advertisements, and/or on their website.

181.   Defendant, Straight Arrow, made these material misrepresentations and omissions

during the class period in order to induce Plaintiff and putative Class Members to purchase the

Mane 'n Tail Products.

182.   Rather than inform consumers that the Products (i) do not contain only approved

high quality ingredients; (ii) are not safe and gentle for all hair types, including colored, permed,

relaxed and chemically treated hair, and (iii) are not hair care solutions for helping to maintain

and achieve long, luxurious, thicker, fuller, healthier-looking hair, Defendant claims on the

Products' labeling and its own website that they "restore, revitalize, and recondition," "help

reduce incidence of itchy and flaking scalp," "enhance softness and shine while reducing frizz, breakage, and split ends," and/or "moisturizes and conditions, leaving hair shiny, silky, and healthy looking," in order to mislead consumers that the Products have those attributes.

183.   Defendant, Straight Arrow, knew the Products (i) do not contain only approved high quality ingredients; (ii) are not safe and gentle for all hair types, including colored, permed, relaxed and chemically treated hair; and (iii) are not hair care solutions for helping to maintain and achieve long, luxurious, thicker, fuller, healthier-looking hair, but nevertheless made such representations through the Products' labeling. In reliance on these and other similar misrepresentations, Plaintiff and putative Class Members were induced to, and did, pay monies to purchase the Products.

184.   Had Plaintiff and the Class known the truth about the Products, they would not have purchased the Products.

185.   As a proximate result of the fraudulent conduct of Defendant, Plaintiff and the putative Class paid monies to Defendant, through its regular retail sales channels, to which Defendant is not entitled, and have been damaged in an amount to be proven at trial.

<u>**COUNT VII**</u>
**Unjust Enrichment**
**(In the Alternative)**
**(Plaintiff Individually and on Behalf of the Nationwide Class and/or**
**Multi-State Class and/or New York Subclass)**

186.   Plaintiff incorporates by reference all of the foregoing paragraphs of this Complaint as if fully stated herein.

187.   Plaintiff brings this claim against Defendant on behalf of herself and the New York Sub-Class.

188.   Plaintiff and the other Members of the New York Sub-Class conferred benefits on

Defendant by purchasing the Products.

189.   Defendant received the benefits to the detriment of Plaintiff and the other Members of the New York Sub-Class because Plaintiff and the other Members of the New York Sub-Class purchased mislabeled Products that are not what they bargained for and that did not provide any of the promised benefits.

190.   Defendant has been unjustly enriched in retaining the revenues derived from the purchases of the Products by Plaintiff and the other Members of the New York Sub-Class. Retention of those monies under these circumstances is unjust and inequitable because Defendant's labeling of the Products was misleading to consumers, which caused injuries to Plaintiff and the other Members of the New York Sub-Class, because they would have not purchased the Products had they known the true facts.

191.   When required, Plaintiff and putative Class Members are in privity with Defendant because Defendant's sale of the Products was either direct or through authorized sellers. Purchase through authorized sellers is sufficient to create such privity because such authorized sellers are Defendant's agents for the purpose of the sale of the Products.

192.   Because Defendant's retention of the non-gratuitous benefits conferred on it by Plaintiff and the other Members of the New York Sub-Class is unjust and inequitable, Defendant must pay restitution to Plaintiff and the other Members of the New York Sub-Class for its unjust enrichment, as ordered by the Court.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of, all others similarly situated members of the Classes, prays for relief and judgment, including entry of an order:

A.  Declaring that this action is properly maintained as a class action, certifying the

proposed Class(es), appointing Plaintiff as Class Representative and appointing Plaintiff's counsel as Class Counsel;

B.   Directing that Defendant bear the costs of any notice sent to the Class(es);

C.   Declaring that Defendant must disgorge, for the benefit of the Class(es), all or part of the ill-gotten profits they received from the sale of the Products, or order Defendant to make full restitution to Plaintiff and the members of the Class(es);

D.   Awarding restitution and other appropriate equitable relief;

E.   Issuing an injunction against Defendant to enjoin it from conducting its business through the unlawful, unfair and fraudulent acts or practices set forth herein;

F.   Scheduling a jury trial and awarding damages according to proof;

G.   Awarding Plaintiff and members of the Class(es) statutory damages, as provided by the applicable state consumer protection statutes invoked above;

H.   Awarding attorneys' fees and litigation costs to Plaintiff and members of the Class(es);

I.   Awarding civil penalties, prejudgment interest and punitive damages as permitted by law; and

J.   Ordering such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury of all claims in this First Amended Complaint so triable.

Dated: September 15, 2021                    Respectfully Submitted,

By:  /s/ *Jonathan Shub*
Jonathan Shub (ID # 4747739)
Kevin Laukaitis*
**SHUB LAW FIRM LLC**
134 Kings Highway E., 2nd Floor
Haddonfield, NJ 08033
T:  856-772-7200
F:  856-210-9088
jshub@shublawyers.com
klaukaitis@shublawyers.com

Andrew J. Sciolla*
**SCIOLLA LAW FIRM LLC**
Land Title Building 1910
100 S. Broad Street
Philadelphia, PA 19110
T: 267-328-5245
F: 215-972-1545
andrew@sciollalawfirm.com

Daniel K. Bryson*
Harper T. Segui*
Erin Ruben*
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN LLP**
900 W. Morgan Street
Raleigh, NC 27603
T: 919-600-5000
dbryson@milberg.com
hsegui@milberg.com
eruben@milberg.com

*Attorneys for Plaintiff and the
Proposed Classes*

*\*Pro Hac Vice Applications Forthcoming*